Eric S. Dwoskin, admitted *pro hac vice* (edwoskin@dwowas.com)
DWOSKIN WASDIN LLP
433 Plaza Real, Suite 275
Boca Raton, Florida 33432
Phone: 561-849-8060

Julie C. Erickson, State Bar No. 293111 (julie@eko.law)
Elizabeth A. Kramer, State Bar No. 293129 (elizabeth@eko.law)
Kevin M. Osborne, State Bar No. 261367 (kevin@eko.law)
ERICKSON KRAMER OSBORNE LLP
44 Tehama Street
San Francisco, CA 94105
Phone: 415-635-0631
Fax: 415-599-8088

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PATRICIA GOOIKER, WILLIAM FINLEY, individually and on behalf of others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>MINDVALLEY, INC.,<br><br>Defendant. | Case No.: 5:24-cv-00593-BLF<br><br>FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL |

Plaintiffs Patricia Gooiker and William Finley, individually and on behalf of all others similarly situated, bring this First Amended Class Action Complaint against Defendant Mindvalley, Inc. ("Mindvalley" or "Defendant") for violations of the federal Video Privacy Protection Act, 18 U.S.C. § 2710 ("VPPA"), and upon personal knowledge as to Plaintiffs' own conduct, and on information and belief as to all other matters including based on an investigation by counsel, allege as follows:

**INTRODUCTION**

1. This is a class action against Mindvalley for violating Plaintiffs' privacy rights under federal law by knowingly disclosing consumers' personally identifiable information, including "information which identifies a person as having requested or obtained specific video materials or services from a video tape provider" ("PII"), through the use of a hidden tracking code created by Meta Platforms, Inc. (formerly known as Facebook) ("Meta") and integrated by Mindvalley into Mindvalley's online video service platforms, including mindvalley.com.

2. Mindvalley owns and operates a subscription-based online video streaming platform called "mindvalley.com." In exchange for a monthly or annual fee, Mindvalley subscribers can request and watch hundreds of educational videos from their computer or mobile device.

3. Unbeknownst to Plaintiffs and members of the Class (defined below), Defendant knowingly and intentionally discloses its consumers' video viewing histories every time they request or watch video content on mindvalley.com.

4. Mindvalley shares its customers' PII with Meta for advertising and marketing purposes via the Meta Pixel on its website.

5. The "Meta Pixel" is a hidden tracking code incorporated into mindvalley.com that sends Meta time-stamped, personally-identifiable records of consumers, such as Plaintiffs and Class members, including information which identifies a person as having requested or obtained specific video materials or services from Mindvalley.

6. Meta combines this personal information with other information about each consumer gathered from other sources and uses it for marketing and advertising purposes.

7. The VPPA prohibits "video tape service providers," such as Mindvalley, from knowingly

disclosing "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider" absent informed, written consent and opt-out rights, which Mindvalley does not obtain or provide.

8. Mindvalley violates the VPPA by sharing its consumers' video viewing histories with Meta via the Meta Pixel.

9. Accordingly, Plaintiffs bring this Class Action Complaint for legal and equitable remedies to compensate Plaintiffs and members of the Class for Defendant's statutory violations and to end Defendant's practice of knowingly disclosing Mindvalley consumers' highly sensitive video viewing histories to third parties.

## JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 over the claims that arise under the Video Privacy Protection Act, 18 U.S.C. § 2710.

11. This Court also has jurisdiction under 28 U.S.C. § 1332(d) because this action is a class action in which the aggregate amount in controversy for the proposed Class exceeds $5,000,000, and at least one member of the Class is a citizen of a state different from that of Defendant.

12. Venue is appropriate in this District pursuant to 28 U.S.C. §1391 because, upon information and belief, (a) Defendant's principal place of business is located at 407 California Avenue, Suite 2, in Palo Alto, California, (b) Defendant does business in this District, (c) a substantial part of the events or omissions giving rise to the claim occurred in or emanated from this District, and (d) Defendant is subject to personal jurisdiction in this District.

13. This action is properly assigned to the San Jose Division under N.D. Cal. Civil Local Rule 3-2(d) because Mindvalley's principal place of business is in Santa Clara County.

## PARTIES

14. Plaintiff Patricia Gooiker is a resident of Oakland, California. Gooiker subscribed to Mindvalley within the last two years and watched videos on Mindvalley during that time period. Gooiker paid for her subscription. Gooiker has had a Facebook account for more than two years. During the relevant time period, Gooiker requested and watched videos on Mindvalley while logged into her Facebook account. By doing so, Gooiker's Mindvalley video viewing history

was disclosed to third parties, including Facebook, pursuant to the systematic process described herein. Gooiker did not provide express written consent—in the form required by the VPPA—to the disclosure of her video viewing history.

15. Plaintiff William Finley is a resident of Fremont, California. Finley subscribed to Mindvalley within the last two years and watched videos on Mindvalley during that time period. Finley paid for his subscription. Finley has had a Facebook account for more than two years. During the relevant time period, Finley requested and watched videos on Mindvalley while logged into his Facebook account. By doing so, Finley's Mindvalley video viewing history was disclosed to third parties, including Facebook, pursuant to the systematic process described herein. Finley did not provide express written consent—in the form required by the VPPA—to the disclosure of his video viewing history.

16. Mindvalley is a Delaware Corporation with its principal place of business in Palo Alto, California. Mindvalley's principal place of business is located in Santa Clara County, California.

## FACTUAL ALLEGATIONS

### A. THE VIDEO PRIVACY PROTECTION ACT

17. The VPPA generally prohibits the knowing disclosure of a customer's video viewing history without the informed, written consent of the customer in a form "distinct and separate from any form setting forth other legal or financial obligations." Under the statute, the Court may award actual damages (but not less than liquidated damages of $2,500.00), punitive damages, equitable relief, and attorney's fees.

18. The VPPA was initially passed in 1988 for the explicit purpose of protecting the privacy of individuals' and their families' video rental, purchase and viewing data. Leading up to its enactment, members of the United States Senate warned that "[e]very day Americans are forced to provide to businesses and others personal information without having any control over where that information goes." S. Rep. No. 100-599 at 7-8 (1988).

19. Senators at the time were particularly troubled by disclosures of records that reveal consumers' purchases and rentals of videos and other audiovisual materials. As Senator Patrick Leahy and the late Senator Paul Simon recognized, records of this nature offer "a window into

our loves, likes, and dislikes," such that "the trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance." S. Rep. No. 100-599 at 7-8 (1988) (statements of Sens. Simon and Leahy, respectively).

20. In proposing the Video and Library Privacy Protection Act (later codified as the VPPA), Senator Leahy stated that "[i]n practical terms our right to privacy protects the choice of movies that we watch with our family in our own homes. And it protects the selection of books that we choose to read." 134 Cong. Rec. S5399 (May 10, 1988). Thus, the personal nature of such information, and the need to protect it from disclosure, is the inspiration of the statute: "[t]hese activities are at the core of any definition of personhood. They reveal our likes and dislikes, our interests, and our whims. They say a great deal about our dreams and ambitions, our fears and our hopes. They reflect our individuality, and they describe us as people." *Id.*

21. While these statements rang true in 1988 when the VPPA was passed, the importance of legislation like the VPPA in the modern era of data mining from online activities is more pronounced than ever before. During a recent Senate Judiciary Committee meeting, "The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century," Senator Leahy emphasized the point by stating that while "it is true that technology has changed" over the years, "we have to be faithful to our fundamental right to privacy and freedom," and "[t]oday the social networking, video streaming, the 'cloud,' mobile apps and other new technologies have revolutionized the availability of Americans' information."[1]

22. In this case, Defendant deprived Plaintiffs and the Class members of that right by knowingly and systematically disclosing their video viewing histories to unauthorized third parties without obtaining informed written consent, as explained herein.

---

[1] *See* Committee on the Judiciary, Subcommittee on Privacy, Technology and the Law, The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century, Senate Judiciary Committee Subcommittee on Privacy, Technology and the Law, available at https://www.govinfo.gov/content/pkg/CHRG-112shrg87342/html/CHRG-112shrg87342.htm (last visited October 20, 2023).

**B. MINDVALLEY VIDEO PLATFORM**

23. Mindvalley owns and operates mindvalley.com.

24. Mindvalley offers a catalog of educational courses and content for consumers to watch.

25. Mindvalley Membership is currently available for $399/year or $49/month in the United States.

26. Mindvalley accountholders can also purchase video content *a la carte*.

27. To use Mindvalley, users create a mindvalley.com account.[2]

28. Users are prompted to take an assessment to assist Mindvalley's personalization.

29. Users are required to fill out a form with their first and last name, their email, zip code, and state.

30. Users then select the payment plan and input their payment information (including payment card information and billing address) to complete their membership.

31. Users are required to verify their email to activate their account.

32. After a user creates an account and begins using the Mindvalley platform, Mindvalley collects a wide variety of additional sensitive information about its consumers, including mailing address, age, gender, marital status, religion, income range, education, professions, parent status, IP address, device type, operating system, browser, login history, location, birthday, telephone, live location, and sexual preference.

33. The account allows consumers to access Mindvalley's exclusive and/or restricted content, products, and services, and to join the Mindvalley community. The account establishes a relationship with Mindvalley. Mindvalley uses the account to establish a commitment between the consumer and the platform so that the consumer is motivated to continue using the platform to achieve their educational goals through the platform. Mindvalley uses the account to establish an association among new Mindvalley consumers, including through a "Private Social Network"

---

[2] Mindvalley members can access Mindvalley video content through a members-only domain (home.mindvalley.com), which also is integrated with the Meta Pixel, described below. For the purposes of this complaint, Plaintiffs refer to mindvalley.com, Mindvalley's default domain, as inclusive of Mindvalley's members-only domain, home.mindvalley.com.

to “meet new friends and allies locally and around the world” and to attend “Events” with “large groups.” Mindvalley provides consumers with many opportunities to express association with the platform, including through Social Links “[f]or Mindvalley members to connect with you.”

34. The version of Mindvalley that is accessible to consumers with an account is not identical to the version of Mindvalley that is available to those who merely access the website through general internet browsing. Similarly, the content of electronic services available to accountholders is different than the information that is available to those who merely access the website through general internet browsing.

35. Upon information and belief, Mindvalley classifies consumers who have accounts differently than those users who merely access the website through general internet browsing. Indeed, Mindvalley classifies them as accountholders and/or subscribers and is able to monetize the relationship with accountholders in a manner that it is unable to do with those who merely access the website through general internet browsing.

36. Upon information and belief, access through an account by a consumer generates value for Mindvalley that mere website access by general internet browsers does not.

37. Mindvalley consumers can request and watch specific educational video materials on mindvalley.com.

38. After a consumer requests specific video materials from Mindvalley, Mindvalley hosts and delivers prerecorded video content for the specific video content requested.

39. The following is an example of the video content available on Mindvalley offered through its Programs.



40. The videos that Mindvalley hosts on its website are integral to its business model of providing educational content to consumers.

**C. THE META PIXEL**

41. The Meta Pixel is a "web beacon" that is used to track and disclose individuals' online activities to Meta.

42. Meta is an advertising company that sells advertising space on the social media platform it operates, including Facebook and Instagram.

43. Meta calls itself a "real identity platform," meaning users are allowed only one account and must share the name they go by in everyday life. Users must provide Meta their first and last name to create an account.

44. Meta's advertising is based on sophisticated user-categorizing and targeting capabilities that are fueled by the personal data of users of its social media platforms and other Internet users.

45. Meta surveils users' online activities both on and off Meta's own websites and apps, which allows Meta to make highly personal inferences about users, such as about their interests, behavior, and connections.

46. Meta compiles information it obtains and infers about Internet users and uses it to identify personalized audiences likely to respond to particular advertisers' messaging.

47. The Meta Pixel is a free and publicly available piece of code that Meta allows third-party website developers to install and integrate into their websites.

48. The code that is used to execute the Pixel functions is written into the base code of the website.

49. The Meta Pixel is installed on a website as a first-party cookie. Cookies are small pieces of text used to store information on web browsers. They store and receive identifiers and other information on computers, phones, and other devices, and they can serve a number of different functions, such as personalizing content and tailoring and measuring ads.

50. A "first-party cookie option" is designed to circumvent improvements in how web browsers block third-party cookies (a primary means by which Meta historically tracked people across the web). Being embedded in websites as a first-party cookie, rather than as a third-party

cookie, causes users' browsers to treat that Pixel as though it is offered by the website they are visiting, rather than by Meta, a third party.

51. When the Pixel is embedded in a website as a first-party cookie, the third-party cookie blocking functions of modern web browsers do not inhibit the Meta Pixel's collection of data.

52. Because of the Pixel design, the Pixel causes users' browsers to treat that Pixel as though it is offered by the website itself.

53. From a technological perspective, the Pixel is a part of the code of the website, and a users' browser understands the Pixel to be a part of the website itself, not from a third-party.

54. The Meta Pixel is configured to capture a substantial amount of information by default.

55. Since 2015 when it was introduced, the Meta Pixel has transmitted HTTP header information to Meta, including the URL of each page visited on a website, by default. HTTP Headers collect "IP addresses, information about the web browser, page location, document, referrer and persons using the website."

56. Meta also automatically collects "Pixel-specific Data," which includes "the Pixel ID and cookie."

57. For Meta account holders, "Pixel-specific Data" includes the "c_user" cookie, which allows Meta to link data to a particular Meta account with a user ID (a "Meta ID").[3]

58. The Meta ID is a unique and persistent identifier assigned to each Meta user.

59. The c_user cookie is personally identifiable information because it contains a consumer's Meta ID. A Meta ID allows anybody—not just Meta—to identify the individual using a website with a Meta account. If anyone types www.facebook.com/[MetaID] into a web browser, it will load that individual's Meta page, which contains a person's name and often a person's photographs and location information.

60. The Meta ID number is a number—just like a social security number, driver's license number, or telephone number—which can be used by anyone to identify an individual.

61. A Meta ID is personally identifiable information. Anyone can identify a Meta profile—

---

[3] The Meta ID is also sometimes called a Facebook ID.

and all personal information publicly listed on that profile—by appending the Meta ID to the end of https://facebook.com.

62. A website developer can also choose to track actions taken on their website with the Meta Pixel, called an "Event." When a chosen action is taken, the Meta Pixel is triggered and sends Meta certain data. Meta then attempts to match the Events it receives to Meta users.

63. The developer can then create "Custom Audiences" based on Events and can target ads on Meta's platforms.

64. Meta associates the information it obtains via the Meta Pixel with other information regarding the user, using personal identifiers that are transmitted concurrently with other personal information the Pixel is configured to collect.

65. Meta assigns a unique numerical identifier to each Meta Pixel and maintains records associating each Pixel with the data it transmits and the website where it is embedded.

## D. MINDVALLEY USES THE META PIXEL TO TRACK AND DISCLOSE USERS' VIDEO VIEWING HISTORIES TO META

66. Mindvalley has integrated the Meta Pixel throughout its website.

67. The numerical identifier associated with the Meta Pixel which currently operates on mindvalley.com is 516697745110301.

68. Below is a screenshot of what the consumer sees when viewing the Mindvalley Program, "Superbrain." The URL contains the title of the video selected—in this example, Superbrain.



69. The below screenshot shows that Mindvalley shares with Meta via the Meta Pixel an "Event" called "PageView" that tells Meta, among other data points, the page that the consumer is viewing on mindvalley.com. The "PageView" Event tells Meta the specific URL of the page the consumer visited, including the name, title, or description of the specific video materials or services selected for viewing. This screenshot also illustrates that Mindvalley also shares the c_user cookie, which includes the consumer's Meta ID.




70. Mindvalley has integrated their website with the "AddtoCart" event that tells Meta the exact content that subscribers add to their Mindvalley online shopping cart for purchase.

71. Mindvalley has also integrated their website with other pixels including "VideoTrack" event, which includes custom parameters, such as "attendeeUUID," "content type," "loggedIn," and "Time in Minutes."

72. The data Mindvalley discloses is tied to unique identifiers that identify specific consumers. The recipients of the data—e.g., Meta—receive both the name of the video content viewed and a unique individual identifier, all as part of a single data transmission.

73. On information and belief, at all relevant times Mindvalley understood the functionality of the Meta Pixel—including that it enabled Mindvalley to show targeted advertising to its subscribers based on their video viewing history—and thus knew that the Meta Pixel disclosed Mindvalley subscribers' individual video viewing histories to Meta.

74. Mindvalley uses customers' video viewing histories to generate revenue. This revenue can come by way of using the data it collects to deliver its own advertisements and services to customers more effectively, selling the data it collects to third parties so that they can direct targeted advertisements to customers, or sharing the data it collects to companies that intend to direct advertisements to customers on the Mindvalley site thereby generating additional advertising revenue for Mindvalley. The fact that Mindvalley generates this revenue is verification that customer's video viewing histories are financially valuable within the online environment where they are exchanged. The value generated by customers' video viewing histories, while small to the customers, is substantial to Mindvalley. Nevertheless, Mindvalley does nothing to compensate consumers for the use of their video viewing histories. Nor does Mindvalley obtain the consent of its customers to sell or share this data in the manner prescribed by the VPPA. This conduct dilutes the value of its customer's data and deprives its customers of its value.

75. Tracking pixels such as the Meta Pixel are not necessary for Defendant to operate Mindvalley's video streaming platform and are instead used for the sole purpose of enabling targeted advertising to Defendant's benefit.

76. As a result of Defendant's data compiling and sharing practices, Defendant has knowingly disclosed to Meta and other third parties for its own profit the video viewing histories of Mindvalley's users.

77. By disclosing its users' video viewing histories to unauthorized third parties—which undeniably reveals their identity and the specific video materials they requested from Defendant's website—Defendant has intentionally and knowingly violated the VPPA.

## CLASS ALLEGATIONS

78. Plaintiffs bring this action individually and on behalf of all others similarly situated as a

class action under Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, on behalf of the following class (the "Class"):

> During the fullest period allowed by law, all persons in the United States who: (1) have a Facebook account; (2) have a Mindvalley account; and (3) requested or viewed videos on mindvalley.com.

79. Excluded from the Class are Defendant, its past or current officers, directors, affiliates, legal representatives, predecessors, successors, assigns and any entity in which any of them have a controlling interest, as well as all judicial officers assigned to this case as defined in 28 USC § 455(b) and their immediate families. Plaintiffs reserve the right to modify, change, or expand the Class definition based upon discovery and further investigation.

80. Numerosity. Members of the Class are so numerous and geographically dispersed that joinder of all members of the Class is impracticable. Plaintiffs believe that there are tens of thousands of members of the Class dispersed throughout the United States. Class members can be identified from Defendant's records.

81. Typicality. Plaintiffs' claims are typical of the claims of members of the Class. Plaintiffs and members of the Class were harmed by the same wrongful conduct by Defendant in that Defendant caused Mindvalley users' video viewing histories to be disclosed to third parties without obtaining express written consent in a manner that complies with the VPPA and without the requisite opt-out rights. Plaintiffs' claims are based on the same legal theories as the claims of other Class members.

82. Adequacy. Plaintiffs will fairly and adequately protect the interests of the Class. By prevailing on his own claims, Plaintiffs will establish Defendant's liability to all Class members. Plaintiffs' counsel is unaware of any conflicts of interest between Plaintiffs and absent Class members with respect to the matters at issue in this litigation; Plaintiffs will vigorously prosecute the suit on behalf of the Class; and Plaintiffs are represented by attorneys with substantial experience and expertise in complex and class action litigation, including in class action privacy litigation. Plaintiffs' attorneys have investigated the claims in this action and have committed sufficient resources to represent the Class.

83. Commonality. Questions of law and fact common to the members of the Class predominate over questions that may affect only individual members of the Class because Defendant has acted on grounds generally applicable to the Class. Such generally applicable conduct is inherent in Defendant's wrongful conduct. Questions of law and fact common to the Classes include:

i. whether Defendant disclosed Class members' video viewing histories to Meta;

ii. whether the information Defendant disclosed to third parties constitutes personally identifiable information under the VPPA;

iii. whether Defendant's disclosure of Class members' video viewing histories to third parties was knowing under the VPPA;

iv. whether Class members consented to Defendant's disclosure of their video viewing histories in a manner that complies with the VPPA; and

v. whether the Class is entitled to damages under the VPPA as a result of Defendant's conduct.

84. Predominance. Such common questions predominate over questions affecting only individual members of the Class.

85. Superiority. The maintenance of the action as a class action will be superior to other available methods of adjudication and will promote the convenient administration of justice. Moreover, the prosecution of separate actions by individual members of the Class could result in inconsistent or varying adjudications with respect to individual members of the Class and/or Defendant. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action. Numerous consumers were cheated out of small sums of money through deliberate behavior of Mindvalley that they could not practically recover in individual suits.

86. Mindvalley's reputation on Trust Pilot, Google Reviews, and the Better Business Bureau reveals persistent problems with customer service and billing practices, including deceptive auto-

renewal and cancellation terms, and delays or refusals to issue refunds. Legal recourse for these problems, however, is only achievable through a class action. Mindvalley's membership cost is a hefty sum for consumers, but far too low to justify the expense of individual litigation.

87. Plaintiffs know of no special difficulty to be encountered in litigating this action that would preclude its maintenance as a class action.

88. Plaintiffs reserve the right to seek certification of Rule 23(c)(4) of common questions related to Defendants' knowledge, conduct, and duties.

## CAUSES OF ACTION

### COUNT 1:

### VIOLATION OF THE VIDEO PRIVACY PROTECTION ACT, 18 U.S.C. § 2710

89. Plaintiffs incorporate the allegations contained in the above paragraphs of this complaint as though fully set forth herein.

90. The VPPA prohibits a "video tape service provider" from knowingly disclosing "personally-identifying information" concerning any consumer to a third-party without the "informed, written consent (including through an electronic means using the Internet) of the consumer." 18 U.S.C § 2710.

91. As defined in 18 U.S.C. § 2710(a)(4), a "video tape service provider" is "any person, engaged in the business, in or affecting interstate commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audiovisual materials."

92. Defendant is a "video tape service provider" as defined in 18 U.S.C. § 2710(a)(4) because it engaged in the business of delivering prerecorded video materials to Mindvalley users.

93. Defendant's business includes delivering Mindvalley users' specific video content hosted on the Mindvalley platform.

94. As defined in 18 U.S.C. § 2710(a)(3), "personally-identifiable information" is defined to include "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider."

95. Defendant knowingly caused information which identifies Plaintiffs and Class members as having requested or obtained specific video materials or services from mindvalley.com to be

disclosed to third parties. This information constitutes personally identifiable information under 18 U.S.C. § 2710(a)(3) because it identified each Plaintiffs and Class member to third parties as an individual who requested or viewed specific video materials on mindvalley.com.

96. As defined in 18 U.S.C. § 2710(a)(1), a "consumer" means "any renter, purchaser, or subscriber of goods or services from a video tape service provider." As alleged in the preceding paragraphs, Plaintiffs rented and/or purchased videos from Mindvalley on mindvalley.com and/or subscribed to mindvalley.com by creating a Mindvalley account and thereafter using Mindvalley to request and view specific video content. Plaintiffs paid for their purchases, rentals, and/or subscriptions for video content from Mindvalley. Plaintiffs are thus "consumers" under this definition.

97. Defendant failed to obtain informed, written consent from Plaintiffs and other Class members for the disclosures described above in a manner that satisfies 18 U.S.C. § 2710(b)(2)(B).

98. Defendant knew that Plaintiffs' and Class members' personally-identifiable information protected under the VPPA was disclosed to third parties, because, *inter alia*, Defendant chose, programmed, and intended for those third parties to receive the video content requested or viewed and the digital subscribers' specific Meta ID.

99. By disclosing Plaintiffs' and the Class's personally-identifiable information protected under the VPPA, Defendant violated Plaintiffs' and the Class members' statutorily protected right to privacy in their video-watching habits. *See* 18 U.S.C. § 2710(c).

100. As a result of the above violations, Defendant is liable to the Plaintiffs and other Class members for damages and other relief, as provided by the VPPA, 18 U.S.C. § 2710(c)(2)(A).

**PRAYER FOR RELIEF**

Plaintiffs, on behalf of themselves and the proposed Class, respectfully request that the Court enter judgement against Defendant as follows:

A. Determine that this action may be maintained as a class action pursuant to Fed R. Civ. P. 23(a), (b)(2), and (b)(3) and declare Plaintiffs as the representatives of the Class and Plaintiffs' Counsel as Class Counsel;

B. For an order declaring that Defendant's conduct as described herein violates the federal VPPA, 18 U.S.C. § 2710(c)(2)(D);

C. For Defendant to pay damages, as provided by the VPPA, 18 U.S.C. § 2710(c)(2)(A);

D. For prejudgment interest on all amounts awarded;

E. For injunctive relief as pleaded or as the Court may deem proper; and

F. For an order awarding Plaintiffs and the Class their reasonable attorneys' fees and expenses and costs of suit, 18 U.S.C. § 2710(c)(2)(C).

**<u>JURY DEMAND</u>**

Plaintiffs hereby demand a trial by jury.

Dated this 29th day of April 2024.

DWOSKIN WASDIN LLP

*/s/ Eric S. Dwoskin*

Eric S. Dwoskin (admitted *pro hac vice*)
433 Plaza Real, Ste. 275
Boca Raton, FL 33432
Phone: (561) 849-8060
edwoskin@dwowas.com

Julie C. Erickson
Elizabeth A. Kramer
Kevin M. Osborne
ERICKSON KRAMER OSBORNE LLP
44 Tehama St.
San Francisco, CA 94105
Phone: 415-635-0631
Fax: 415-599-8088
julie@eko.law
elizabeth@eko.law
kevin@eko.law

*Attorneys for Plaintiffs and the Putative Class*

**E-FILING ATTESTATION**

I, Kevin M. Osborne, am the ECF User whose ID and password are being used to file this document. In compliance with Civil Local Rule 5-1(i)(3), I hereby attest that each of the signatories identified above has concurred in this filing.

*/s/ Kevin M. Osborne*
Kevin M. Osborne